**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 29, 2012
Decided March 12, 2012

**Before**

WILLIAM J. BAUER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

No. 11-2838

| | |
|---|---|
| FLORENCE SMITH, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 1:10-cv-02789 |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social Security, | Morton Denlow, |
| *Defendant-Appellee*. | *Magistrate Judge*. |

**O R D E R**

Florence Smith applied for disability insurance benefits, claiming to be disabled primarily by a condition that caused persistent swelling in her right leg. An administrative law judge disbelieved Smith's description of the severity of her condition and denied her claim. The district court upheld that determination, and Smith appeals. Because the ALJ failed to explain why she did not believe Smith had to elevate her leg to reduce swelling or why she found Smith not credible, we reverse the judgment and remand the case with instructions that it be returned to the agency for further proceedings.

Smith, 57, suffers from a chronic arteriovenous malformation ("AVM") in her right leg, rheumatoid arthritis, and carpel tunnel syndrome. AVMs are defects in the circulatory system

made up of "snarled tangles of arteries and veins." National Institute of Neurological Disorders and Stroke, *Arteriovenous Malformations and Other Vascular Lesions of the Central Nervous System Fact Sheet*, http://www.ninds.nih.gov /disorders/avms/detail_avms.htm#176723052 (last updated Feb. 28, 2012); *see also* STEDMAN'S MEDICAL DICTIONARY 1147 (28th ed. 2006). Smith's leg problems dated back to 1979, though she reported that they worsened substantially in 2008 following a 16-hour car ride to Georgia. In May 2008 she spent three days in the hospital and was advised to elevate her leg when sitting to relieve swelling. Her leg swelling decreased over the next two weeks, according to a progress note, but there was still "moderate" edema and Smith tried to elevate her leg "when possible." A month after her hospital visit, Smith's condition had again improved, but her edema was still described as "severe."

In August 2008 Smith applied for disability benefits, contending that she had been disabled since December 31, 2007, her last day of work as a water tester at the Illinois Environmental Protection Agency. In a report filled out shortly after her application, she wrote that she tried to keep her feet up "as much as possible to keep swelling down." Her husband Marc wrote that she "spends most of the day w/leg elevated to keep swelling and pain under control" and that her AVM "necessitates constant elevation of the leg."

Dr. Mahesh Shah, a state-agency physician, examined Smith in September 2008 in connection with her application for benefits. He noted that she had "mild discomfort in the right lower leg" but that she could move around his office "without problems." Regarding Smith's AVM, he concluded that she was "almost asymptomatic." Around the same time, a different state-agency doctor prepared a Physical Residual Functional Capacity Assessment form and concluded—based on a review of Smith's medical records—that she could perform light work, meaning, among other things, that she could stand and/or walk for about six hours in an eight-hour workday.

After Smith's application was denied initially and on reconsideration, she had a hearing in front of an ALJ, where she appeared pro se. She testified that her leg swelled "every day, all day" and that she could walk only "a couple of blocks" before her leg started hurting. She told the ALJ that she elevated her leg as often as possible and could sit through an hour-long television show only if her leg was elevated.

A vocational expert then testified. Responding to a hypothetical posed by the ALJ, the VE reported that a person with Smith's age, education, and work experience who was limited to the exertional requirements of light work could not perform Smith's previous position as a water tester. But such a person, the VE told the ALJ, could work as a cashier or information clerk or in "assembly type of positions," all of which existed in significant number in the

Chicago area. When asked if her analysis would change if the claimant needed to sit or stand at will, the VE responded that the cashier jobs would be eliminated, but that there would still be information-clerk and assembly positions. She added that the claimant could perform hand-packaging jobs, about 1,500 of which existed locally.

In rejecting Smith's claim of disability, the ALJ concluded that her various ailments did not preclude her from doing light work, *see* 20 C.F.R. § 404.1567(b), so long as she had a job where she could sit or stand at will. Navigating through the required five-step analysis, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), the ALJ determined that Smith had not worked since her alleged onset date (step one); her rheumatoid arthritis constituted a severe impairment (step two); her impairments did not meet or equal a listed impairment (step three); she had a residual functional capacity ("RFC") to perform light work so long as she could sit or stand at will, though she could no longer be a water tester (step four); but, based on the VE's response to the second hypothetical, there existed jobs in the economy that she could do given her RFC (step five). In evaluating Smith's RFC, the ALJ wrote that she found Smith's testimony regarding the extent of her symptoms "not credible to the extent they are inconsistent with the above residual functional capacity assessment." The ALJ then listed some of the medical evidence, including the results of Dr. Shah's evaluation and the subsequent RFC assessment prepared by the non-examining state-agency doctor, and followed with a one-sentence paragraph in which she concluded that Smith did not need to elevate her leg.

In the district court, Smith, by now represented by counsel, argued that the ALJ had not addressed adequately her need to elevate her right leg. The magistrate judge, presiding with the parties' consent, rejected that argument as "unsubstantiated," and added that "the record lacks evidence that Claimant needed to continue elevating the leg" after the hospital stay. The magistrate judge also rejected a challenge to the ALJ's credibility determination, acknowledging that the ALJ's discussion was "not perfect" but concluding that it nevertheless was "clear enough to permit meaningful review" and not patently wrong.

On appeal Smith challenges four aspects of the ALJ's decision, which we review as the final word of the Commissioner because the Appeals Council declined review. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). We limit our review to the reasoning set forth in the ALJ's written decision, *see Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011), assessing whether the decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson*, 402 U.S. at 401).

First we address Smith's two arguments attacking the ALJ's RFC determination. Smith contends that in evaluating her RFC, the ALJ failed to explain both why she rejected Smith's assertion that she must elevate her leg and why she found Smith not credible. Regarding leg elevation, Smith notes that the ALJ made only a cursory comment on this point: "The medical records do not support the limitations alleged by the claimant that she is medically required to elevate her legs." The ALJ failed to link any of the evidence to her conclusion regarding leg elevation, Smith asserts, and she accuses the Commissioner of trying to salvage the ALJ's conclusion through "post hoc rationalization."

Given the perfunctory nature of the ALJ's discussion of leg elevation, we agree with Smith. An ALJ must explain her reasoning, building a so-called "logical bridge" that connects the evidence and her decision. *See Scott*, 647 F.3d at 740; *O'Connor-Spinner*, 627 F.3d at 618; *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677–78 (7th Cir. 2008). The ALJ here did cite to some medical records (mostly from Dr. Shah's review) but did not explain *how* the records undermined Smith's testimony that she needed to elevate her leg. Contrary to the magistrate judge's conclusion, there was evidence in the record that Smith had to elevate her leg, including her hearing testimony; the reports she and her husband filled out for the agency shortly after she filed her application; records from her hospital stay, which included instructions to keep the leg elevated after discharge; and records from the two follow-up appointments, at which the edema in her leg was characterized as either "moderate" or "severe." The ALJ did not explain why she disregarded this evidence and instead credited Dr. Shah's evaluation. This error cannot be deemed harmless because we cannot say "with great confidence" that the result would be the same on remand. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The ALJ never considered Smith's RFC in light of her alleged need to elevate her leg or asked the VE how a leg-elevation requirement would affect Smith's job prospects.

The Commissioner tries to bolster the ALJ's limited analysis by arguing that Smith's continued need for leg elevation is not well documented by her treating doctors. The Commissioner notes that Smith sought only minimal care after her three-day hospitalization in 2008, that her treating doctor did not mention leg elevation during the second follow-up visit, and that Dr. Shah also said nothing about leg elevation in his report. But whatever the strength of this evidence, the ALJ did not rely on any of it in reaching her conclusion, and under *SEC v. Chenery Corporation*, 318 U.S. 80, 87–88 (1943), "what matters are the reasons articulated *by the ALJ*," not the rationale advanced by the government on appeal. *Jelinek*, 662 F.3d at 812 (emphasis in original); *see also Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). And while the record on this issue is relatively sparse, to the extent the ALJ needed a fuller record to make her decision, she had a duty to develop it, particularly because Smith appeared pro se.

*See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997).

Smith argues further that the ALJ's adverse credibility determination is similarly cursory and unsupported. She urges that the ALJ failed to explain how the record evidence supported the decision to discredit her statements about the debilitating effects of her symptoms. And Smith contests the ALJ's use of the boilerplate statement that "the claimant's statements concerning the intensity persistence and limiting effects" of her symptoms "are not credible to the extent they are inconsistent with the above residual functional capacity assessment."

Smith's argument on this point is well-taken. We have derided repeatedly this sort of boilerplate as meaningless and unhelpful to a reviewing court. *See Bjornson v. Astrue*, —F.3d—, 2012 WL 280736, at *4 (7th Cir. Jan. 31, 2012); *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011); *Parker*, 597 F.3d at 921–22. This boilerplate is especially unhelpful because it "implies that the ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards." *Bjornson*, 2012 WL 280736, at *5. Often, as here, the assessment of the claimant's ability to work depends at least in part on the credibility of the claimant's testimony regarding the intensity of her symptoms. *See id.* And while the subsequent paragraphs of the ALJ's opinion tick off certain medical evidence, this account does not specify how the evidence undermines Smith's credibility or which statements the ALJ found not credible. Some of the evidence cited, such as Dr. Shah's conclusion that Smith was "almost asymptomatic," appear to support the ALJ's conclusion; other cited evidence, such as Smith's height (64 inches) and weight (179 pounds), bears no clear relevance to the adverse credibility determination. Because the ALJ did not support her credibility determination with reference to specific record evidence, we cannot assess whether the credibility determination was "patently wrong." *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

In light of the foregoing discussion, we need not address Smith's other two arguments, which assail the ALJ's step-five conclusion regarding the availability of jobs she could perform.

The judgment of the district court is **REVERSED**, and the case is **REMANDED** with instructions that it be returned to the agency for further proceedings consistent with this order.