NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Argued November 13, 2012
Decided March 7, 2013

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 12-1749

|  |  |
|---|---|
| LATEISHA SAWYER, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *Plaintiff-Appellant*, | |
| *v.* | |
| | No. 10 cv 8019 |
| CAROLYN W. COLVIN,[*] | |
| Acting Commissioner of Social Security, | Arlander Keys, |
| *Defendant-Appellee.* | *Magistrate Judge.* |

**O R D E R**

Leteisha Sawyer challenges the denial of her application for Social Security disability benefits. An administrative law judge found that although medically determinable impairments keep Sawyer from resuming past jobs, she retains the residual functional capacity to perform other work. The district court upheld this ruling, *see* 42 U.S.C. 408(g), and Sawyer appeals. She argues that the ALJ failed to (1) validly assess her credibility; (2) appropriately evaluate certain medical opinions; and (3) explore a possible conflict between a vocational expert's testimony and the Dictionary of Occupational Titles. We reject these contentions and conclude that substantial evidence supports the denial of benefits.

---

[*] Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure, we have substituted Carolyn W. Colvin for Michael J. Astrue as the named defendant-appellee.

Sawyer was at her job as an ophthalmic technician when, at age 31, she suffered an electrical shock from a faulty light switch. She told emergency-room physicians that the jolt had left her feeling confused, a bit "stunned," and weak on her left side but had not caused her to faint or experience incontinence. Doctors did not see a wound typical of electrical shock, and Sawyer's speech was normal, she could move her extremities appropriately, and she was alert and oriented. She was cleared to return to work and released the same day. A few weeks later she followed up with her personal physician, Dr. Stephanie Mauch. Sawyer engaged in normal conversation but complained of fatigue, anxiety, and insomnia.

In May 2007, two months after the accident, Sawyer had a panic attack after walking by the room with the faulty switch. But she was not in distress when she reached the emergency room, and once more she was cleared to resume working without restrictions. Afterward she consulted Dr. Mauch, who prescribed medications for anxiety.

The next month Sawyer seemed agitated and developed a stutter. She began weekly therapy with a psychologist, Dr. Judi McInerney. During an intake evaluation Sawyer was calm, her speech coherent, and her memory, judgment, and comprehension all normal. She was diagnosed with adjustment disorder with anxiety and depression. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS § 309.23 (4th ed. text rev. 2000) ("DSM-IV-TR").

In July 2007 Sawyer began changing her story about the accident. She contradicted her previous statements and told Dr. Anne Li that the shock had caused a blackout and urinary incontinence. Sawyer now claimed to be experiencing memory loss, poor concentration, uncontrollable shaking, and a stutter, all of which she attributed to posttraumatic stress disorder. This display of symptoms, thought Dr. Li, was "quite dramatic and impressive." She identified a generalized anxiety disorder but said that PTSD cannot be diagnosed before six or more months after a precipitating trauma. Dr. Li noted that Sawyer had been adamant about not returning to work.

That same month Sawyer was evaluated by another psychologist, Dr. Richard Alfrod. His testing produced mixed results: Sawyer's speech and hand movements were excessively slow, but she scored well in some areas of cognitive functioning like memory recall and sustained attention. Dr. Alfrod diagnosed PTSD and an unspecified cognitive disorder. In his notes he described Sawyer as having reported moderate to severe stressors related to an "inability to function" and "inability to work." He also commented that brain lesions are typical among victims of electrical shock, but the MRI he requested showed nothing unusual. He recommended treatment by a neuropsychiatrist familiar with the effects of electrical shock.

Sawyer heeded Dr. Alfrod's advice and consulted neuropsychiatrist Amrita Bijari in August 2007, but her story changed again. This time she added total paralysis to the blackout and incontinence she claimed to have experienced after the shock. Dr. Bijari observed signs of weight gain, anxiety, depression, tremors, and stuttering but normal cognitive functioning and memory. Dr. Bijari noted improvement by month's end and opined that Sawyer likely was experiencing a "conversion reaction," the transformation of anxiety into physical symptoms without a physiological basis. *See* DSM-IV-TR, *supra*, § 300.11.

That month Sawyer applied for Disability Insurance Benefits and Supplemental Security Income. She listed as impairments PTSD, depression, anxiety, panic attacks, and stuttering. Dr. McInerney wrote her a note—addressed "to whom it may concern"—saying that Sawyer was "unable to return to any work at this time." He did not elaborate.

In November 2007, three months after applying for benefits, Sawyer first consulted

a speech therapist for severe stuttering, slurred speech, and seemingly uncontrolled voice changes. The therapist perceived Sawyer to have impaired concentration and attention, rapid mental fatigue, and memory deficits. Even so, the therapist concluded, Sawyer's prognosis was "good to excellent," in part because she expressed a desire to improve and return to work. During the following weeks, Sawyer's stuttering diminished but did not disappear entirely.

Her condition then seemed to worsen dramatically. In January 2008, just four days after Dr. Li described Sawyer's mood as improved, she sobbed through a 65-minute evaluation by psychologist John Peggau, who said her affect was more "emotionally unstable" than any previous patient. Throughout the session Sawyer used earplugs, wore a hooded coat and dark sunglasses, and spoke with dramatic pauses and a constant stutter that Dr. Peggau did not believe was physiologically based. Sawyer was antagonistic toward Dr. Peggau's questions and insisted that she was unable to count and did not know her age, the date, the President's name, or the colors of the American flag. She recounted hardships with daily life and said she lacked friends and sometimes just stayed in bed. Dr. Peggau surmised that she likely was embellishing and possibly malingering.

Later that month Dr. Helen Appleton, a state-agency psychologist, reviewed the medical record and assessed Sawyer's mental residual functional capacity. Dr. Appleton noted marked limitations in Sawyer's capacity to interact with the public and to comprehend and execute detailed instructions. She also noted moderate limitations in accepting direction, asking simple questions or for help, concentrating for lengthy periods, and reacting to changes at work or criticism from supervisors. Dr. Appleton opined,

however, that malingering likely accounted for Sawyer's other apparent limitations. The psychologist concluded that Sawyer could perform "simple, routine tasks" requiring incidental social contact but not "complex, detailed tasks." A few days later, another medical consultant similarly opined that Sawyer did not suffer from any "severely restrictive medically determinable impairment."

In February 2008 the Social Security Administration denied Sawyer's applications, and she requested reconsideration. Meanwhile, her symptoms remained inconsistent. She told Dr. Mauch that her hearing sensitivity was worsening, and the doctor assessed her anxiety as poorly controlled. Then in April, when Dr. Mauch saw her again after an apparent overdose of medication, Sawyer was relaxed and tested within normal ranges for knowledge, language, memory, judgment, attention span, and concentration. In May the doctor assessed her anxiety as "improved" despite continuing "symptoms of a major depressive episode." Again Sawyer's cognitive skills seemed normal.

In June 2008 the agency denied reconsideration, and Sawyer requested a hearing before an ALJ. By August 2008 she again was reporting anxiety, fatigue, depression, and panic attacks, though Dr. Mauch still assessed her cognitive functioning as normal.

The hearing was conducted in August 2009. Two doctors, a vocational expert, and Sawyer testified. Dr. James McKenna, an internist, doubted most of Sawyer's medical complaints. He suggested that medical evidence had disproved her complaints at least twice and said that experts had found no physiological or developmental basis for her impaired speech. He conceded that Sawyer possibly suffered from two physical impairments—obesity and asthma—though neither disabling. He recommended that she avoid jobs with "concentrated exposure to extreme cold or to respiratory irritants."

Dr. Kathleen O'Brien, a psychologist, discounted a diagnosis of conversion disorder, which is rare, but concluded that medical evidence did support findings of PTSD and anxiety. Still, she noted that Sawyer's functional deficits had been erratic over time, an observation she linked with Dr. Peggau's suspicion that Sawyer had exaggerated her symptoms or was malingering. Dr. O'Brien observed, for example, that Sawyer had told Dr. Peggau she sometimes feared leaving her house, and yet the administrative record mentions a vacation cruise and trips to Arizona and Las Vegas. The doctor also noted that at times Sawyer had denied even remembering her birthday, and yet other times she was articulate. In assessing Sawyer's mental residual functional capacity, Dr. O'Brien limited her to simple tasks with limited public contact. She opined that Sawyer could work with others but probably could not satisfy above-average production quotas.

Sawyer said she had been stuttering since her accident, though the ALJ was unconvinced that he was hearing a true stutter. Dr. McKenna and Dr. O'Brien also questioned parts of Sawyer's testimony. She attributed her hearing sensitivity to a seizure, but Dr. McKenna countered that the medical record did not include evidence of a seizure disorder. Sawyer said, too, that high-pitched sounds trigger blackouts, yet Dr. O'Brien opined that PTSD may cause hearing sensitivity though not fainting.

Sawyer also described difficulties sleeping and concentrating, and with everyday hygiene. She lived alone but said that because of fatigue she relied on family to help with household chores. And except for medical appointments, Sawyer added, she rarely left her house. She offered to call family members for corroboration, but the ALJ accepted that their testimony would track hers and thus deemed it unnecessary.

Last, the vocational expert opined that given the limitations acknowledged by the testifying doctors, Sawyer cannot perform her past work. Yet she's employable, the witness said, including as a mail sorter, food-service worker, or housekeeper. The ALJ did not ask if the vocational expert's views correspond with the Dictionary of Occupational Titles published by the Department of Labor, but neither did Sawyer suggest inconsistency.

The ALJ concluded that Sawyer was not disabled. At Step 1 of the sequential analysis, *see* 20 C.F.R. § 404.1520(4), he found that Sawyer no longer was engaged in substantial gainful activity. At Steps 2 and 3, the ALJ concluded that she suffers from severe medical impairments—PTSD and obesity—though not to a degree meeting the criteria for presumptive disability. And at Steps 4 and 5, the ALJ agreed with the vocational expert that Sawyer cannot resume her past work but remains capable of performing unskilled jobs. Sawyer's contrary testimony, the ALJ explained, was not convincing.

The Appeals Council declined review, making the ALJ's ruling the final decision of the Commissioner of Social Security. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). We review that ruling directly, without deference to the district court's assessment, and will uphold the ALJ if substantial evidence supports his decision. *Prochaska v. Barnhart*, 454 F.3d 731, 734–35 (7th Cir. 2006). ALJs need not discuss every piece of evidence but must provide "an accurate and logical bridge" between the evidence and their conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

In this court Sawyer first contends that the ALJ rejected her claim of disability without first assessing her credibility. We disagree. The ALJ said explicitly that he was "not convinced by the claimant's presentation at the hearing." Sawyer disregards this statement and instead asserts that the ALJ must have failed to assess her credibility because at one point in his written decision, he acknowledges entertaining as "possible" that Sawyer

"actually suffers from disorders that grossly constrict her functioning to the degree she describes at the hearing." But Sawyer would have us take this statement out of context and ignore what else the ALJ said: that the medical evidence refutes this possibility.

Sawyer counters that if the ALJ did evaluate her credibility, then he violated SSR 96-7p—which lists factors that must be considered in assessing credibility—by simply contrasting her self-reports of her functioning with the observations of medical personnel. Again we disagree. This court gives considerable deference to an ALJ's credibility finding and will uphold it unless "patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). And although a claimant's complaints cannot be "disregarded solely because they are not substantiated by objective medical evidence," SSR 96-7p, 1996 WL 374186, at *1, *6 (July 2, 1996); *see Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009), the ALJ's credibility decision rests on much more. The ALJ noted that Sawyer had shown no "clinical signs of any physically significant electrical injury," had described "dramatic symptoms" despite unremarkable clinical examinations, and—according to doctors—likely had been embellishing her impairments or malingering. The ALJ also gave weight to Dr. O'Brien's observations that Sawyer had reported uncharacteristically varied symptoms, that her accounts of fainting were abnormal with PTSD, and that her "reported hypersensitivity to sound is not associated with any established medical disorder." And, the ALJ observed, Sawyer still lived alone despite describing a level of everyday functioning that would make caring for herself doubtful.

That some of this support for the ALJ's credibility assessment is woven into his analysis of Sawyer's residual functional capacity, rather than a discussion limited to credibility, is insignificant. The regulations anticipate overlap. *See* 20 C.F.R. § 404.1529(a), (c)(4); SSR 96-7p, 1996 WL 374186, at *3; *Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012). Credibility assessments need not be explicit, *Arbogast v. Bowen*, 860 F.3d 1400, 1406 (7th Cir. 1988), or particularized to specific testimony, *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012).

Sawyer also insists that the ALJ violated agency regulations by excluding corroborating testimony from her aunt and uncle. *See* 20 C.F.R. 404.1529(c); SSR 96-7p, 1996 WL 374186, at *1, *5. But this exclusion does not undermine his credibility assessment. The ALJ did not close himself to testimony from these relatives because he already had decided that Sawyer was not credible. *See Barnett v Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). Rather, the ALJ acknowledged that her aunt and uncle would corroborate Sawyer's testimony that they helped with meals, household chores, grocery shopping, transportation to medical appointments, and sometimes bathing. The offer of proof was part of the reason that the ALJ concluded that Sawyer *does* have a severe impairment that prevents her from

performing her past work. He could—and did—find that Sawyer was unable to perform some household tasks without assistance and yet still was exaggerating her symptoms.

Finally, concerning her credibility, Sawyer faults the ALJ for not mentioning a glowing reference from her former employer. She disclaims suggesting that the ALJ was required to "explain why an outstanding worker would start faking symptoms" but insists that any information bearing on credibility must be taken into account. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). As we've said, however, ALJs are not required to discuss every piece of evidence, and that principle applies equally to a credibility assessment. *Villano*, 556 F.3d at 562; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). It is enough that in view of the record as a whole, the ALJ's determination rests on substantial evidence. *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

Moving beyond the question of her own credibility, Sawyer next argues that the ALJ ignored certain medical opinions and weighed others improperly in violation of 20 C.F.R. § 404.1527. Most importantly, according to Sawyer, the ALJ ignored the opinion of Dr. McInerney, her treating psychologist, that she was "unable to return to work at this time" due to PTSD and anxiety. This remark appears in a note addressed to "whom it may concern" that Dr. McInerney wrote shortly after Sawyer applied for benefits. Sawyer also points to Dr. Alfrod's observation when he diagnosed PTSD that she had "moderate to more severe stressors regarding changes and inability to function, inability to work."

Sawyer presumes those remarks to be "medical opinions," but she is wrong. The Social Security Administration defines medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Excluded from this definition are opinions about a claimant's ability to work, a question that the regulation reserves for the Commissioner alone. *See* 20 C.F.R. § 404.1527(d)(1); *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002). Thus, the ALJ did not have to weigh these comments like medical opinions.

That's not to say that the ALJ ignored the relevant views of Dr. McInerney and Dr. Alfrod in assessing Sawyer's residual functional capacity. *See* 20 C.F.R. § 404.1527(d)(2)–(3); *Bjornson*, 671 F.3d at 647–48; *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). Sawyer concedes that the ALJ briefly summarized the reports from both doctors. The only deficiencies she perceives in those summaries are the exclusion of Dr. Alfrod's test results concerning her slow hand movements and any mention of the doctors' opinions about her capacity for work. The significance of Dr. Alfrod's testing eludes us because Sawyer does not argue that slow hand movements preclude her from working as a

housekeeper, mail sorter, or hospital food-service worker. And as we've explained, the doctors' views about Sawyer's ability to work are not part of the medical evidence that the ALJ was summarizing. Moreover, their narrow opinions that Sawyer was unable to work at a specific point of time do not speak to whether that restriction persisted long enough to make her impairments disabling. *See* 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A); *Roberson v. Astrue*, 481 F.3d 1020, 1024 (8th Cir. 2007).

Sawyer does not stop, however, with Dr. McInerney and Dr. Alfrod. She also argues generally that the ALJ failed to weigh the medical opinions of record using the regulatory factors. Sawyer correctly notes that the ALJ explicitly weighed only the medical opinion of the testifying medical expert, Dr. McKenna, whose views the ALJ deemed "the most informed, consistent with the medical evidence of record, convincing, and consistent with the record as a whole." Sawyer also correctly notes that an ALJ must address certain factors in evaluating medical opinions—including the frequency and nature of any examinations or treatment, whether the opinion is supported by tests or the record, and the doctor's expertise —and "give good reasons" for the weight given to a treating source's opinions. 20 C.F.R. § 404.1527(c); *Craft*, 539 F.3d at 676. Although the ALJ did not lay out these factors one by one, he did discuss most of them in his summary of each doctor's opinion. For example, when discussing Dr. Alfrod, the ALJ noted that he had examined Sawyer only during a single screening session shortly before she applied for benefits.

The ALJ's decision explains why he credited Dr. McKenna over other doctors. The ALJ recognized, as Sawyer acknowledges, that Dr. McInerney's progress notes document not only her symptoms of anxiety and depression but also her improvement over time. The ALJ observed also that although Dr. Alfrod's neurological screening had led him to diagnose Sawyer with an unspecified cognitive disorder and PTSD, he also recommended that she consult a neuropsychiatrist familiar with victims of electrical shock. Sawyer did see a neuropsychiatrist, Dr. Bijari, who, as the ALJ notes in his decision, discounted a physiological cause for Sawyer's afflictions.

Sawyer last discusses Dr. Appleton, the state-agency psychologist who assessed her mental residual functional capacity. In Sawyer's view the ALJ did not explain the import of Dr. Appleton's opinions that she was "markedly limited in the ability to interact appropriately with the general public" and "moderately limited in the ability to ask simple questions or request assistance, accept instructions and respond appropriately to changes in the work setting." We disagree. Sawyer is correct that an ALJ must consider opinions from state-agency consultants, *see* 20 C.F.R. § 404.1527(e), but these opinions were incorporated into Dr. Appleton's narrative assessment of Sawyer's mental residual functional capacity, which the ALJ summarizes in his decision, *see Craft*, 539 F.3d at 677 (citing 20 C.F.R. § 404.1545(c); SSR 85-15, 1985 WL 56857); *Johansen*, 314 F.3d at 289. The ALJ adequately

explained the weight given to Dr. Appleton's opinions by noting that her "conclusions supported a finding that the claimant's impairments were not *per se* disabling, and would not prevent the performance of unskilled work." The ALJ relied on this and other evidence in concluding that Sawyer's residual functional capacity limited her to unskilled work.

That brings us to Sawyer's final appellate claim. She argues that the ALJ should have asked the vocational expert whether her testimony conflicts with the Dictionary of Occupational Titles and then resolved any inconsistency. Social Security Ruling 00-4p directs that ALJs "[i]dentify and obtain a reasonable explanation for any conflicts" between a vocational expert's testimony and the dictionary, and also "explain in the determination or decision how he or she resolved the conflict." SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); *see Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir. 2008); *Prochaska*, 454 F.3d at 735. Although ALJs have an "affirmative responsibility" to ask whether the vocational expert's testimony conflicts with the dictionary, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Overman*, 546 F.3d at 462, this ruling "requires only that the ALJ investigate and resolve *apparent* conflicts," *Overman*, 546 F.3d at 463. And, as Sawyer concedes, if there is not an actual conflict between the vocational expert's testimony and the Dictionary of Occupational Titles, a claimant cannot possibly be harmed by an ALJ's failure to inquire. *See Terry*, 580 F.3d at 478; *Ketelboeter v. Astrue*, 550 F.3d 620, 625–26 (7th Cir. 2008); *Prochaska*, 454 F.3d at 736; *Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007); *Massachi v. Astrue*, 486 F.3d 1149, 1154 n.19 (9th Cir. 2007). The district court discussed what it called a "potential" conflict, but potential is not actual, and anyway we are not bound by the district court's view.

Sawyer perceives two conflicts between the vocational expert's testimony and the dictionary. First, she sees a conflict because the vocational expert relied on Dr. O'Brien's opinion that she should be restricted to "simple tasks," and yet the vocational expert said she could perform jobs that have a reasoning-development level of 3 and require a worker to use "commonsense understanding to carry out instructions" and address "problems involving several concrete variables in or from standardized situations." DICTIONARY OF OCCUPATIONAL TITLES, App. C, *available at* http://www.oalj.dol.gov/PUBLIC/DOT/ REFERENCES/DOTAPPC.HTM (last visited Jan. 24, 2013). But where is the conflict? In limiting Sawyer to "simple tasks," Dr. O'Brien opined that she had experienced only "mild to sometimes moderate" difficulties with activities of daily living, mild difficulties with social interaction, and "moderate" difficulties with concentration, persistence, and pace. Yet a mild, or even a moderate, limitation in an area of mental functioning "does not prevent an individual from functioning 'satisfactorily.'" *Roberson*, 481 F.3d at 1024. That point is clear from the agency's Psychiatric Review Technique, Form SSA-2506-BK.

Despite Sawyer's insistence, it is immaterial to SSR 00-4p that Dr. Appleton, the state-agency psychologist, had opined 18 months before the hearing that Sawyer was "markedly limited" in her ability to understand, remember, and execute "detailed," but not "short and simple," instructions. The vocational expert's opinion about the jobs available to Sawyer was based on the testimony of the doctors present at the hearing—Dr. McKenna and Dr. O'Brien—not the assessment of Dr. Appleton. Neither testifying doctor echoed Dr. Appleton's view about Sawyer's capacity to handle detailed instructions, so Dr. Appleton's opinion on that subject cannot possibly be the root of a conflict between the vocational expert's testimony and the dictionary, which is the only concern of SSR 00-4p. It may be that Sawyer now sees a disagreement between *Dr. O'Brien* and Dr. Appleton, but that perceived disagreement was not explored by Sawyer at the hearing and is not relevant to SSR 00-4p. And at all events, even workers who are markedly limited in their ability to understand, remember, and follow detailed instructions might still be able to perform jobs requiring level 3 reasoning development. *Hiller v. Social Sec. Admin.*, 486 F.3d 359, 366–67 (8th Cir. 2007) (rejecting contention that ALJ improperly relied upon vocational expert's testimony that claimant could work as cashier, a level 3 job, despite being limited to understanding, remembering, and following *simple* instructions); *Roberson*, 481 F.3d at 1024-25 (concluding that ALJ's finding that claimant had the residual functional capacity to resume working as computer programer was not inconsistent with medical evidence, including psychologist's opinion that claimant was "'markedly' limited in her ability to understand, remember, and carry out detailed instructions").

The second conflict asserted by Sawyer concerns her alleged speech issues. The Dictionary of Occupational Titles lists as a qualification for housekeepers the ability to "[s]peak [in] simple sentences, using normal word order, and present and past tenses," and for food-service workers and mail clerks, the capacity to "[s]peak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses." *See* DICTIONARY OF OCCUPATIONAL TITLES, at App. C. But here, too, the conflict is illusory because the vocational expert relied on Dr. McKenna and Dr. O'Brien, and neither thought Sawyer's speech was impaired. Moreover, even if Sawyer cannot meet the language standards for food-service workers or mail clerks (which is not shown by the record), she apparently can satisfy the lower threshold for housekeepers. *See Ketelboeter*, 550 F.3d at 626; *Clay v. Barnhart*, 417 F.3d 922, 931 (8th Cir. 2005).

On a final note, Sawyer devotes considerable attention to our decision in *Terry*, which touches on whether an ALJ's failure to ask if a vocational expert's testimony contradicts the Dictionary of Occupational Titles might still be harmless even if a conflict does exist. *See Terry*, 580 F.3d at 478. But given our conclusion that Sawyer has not identified an actual conflict, her focus on *Terry* is a distraction. Even Sawyer concedes that

noncompliance with the "affirmative responsibility" to inquire about conflicts is inconsequential if there is no conflict, and that principle governs this appeal. At this point any further dissection of SSR 00-4p or *Terry* would be dicta.

Accordingly, we **AFFIRM** the district court's judgment.