**Matthew W. DOUCETTE, Plaintiff,**

**v.**

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**Civil Action No. 12–11097–JLT.**

United States District Court,
D. Massachusetts.

Sept. 25, 2013.

---

Stephen L. Raymond, Law Office of Stephen L. Raymond, Esq., Haverhill, MA, for Plaintiff.

Anton P. Giedt, United States Attorney's Office, Thomas D. Ramsey, Office of the General Counsel, Boston, MA, for Defendant.

## MEMORANDUM

TAURO, District Judge.

### I. Introduction

This case arises under 42 U.S.C. § 405(g), as a review of a denial of disability benefits by the Social Security Administration ("SSA"). Presently at issue are Plaintiff's *Motion for Judgment on the Pleadings* [# 12] and Defendant's *Motion to Affirm the Commissioner's Decision* [# 18]. For the following reasons, Plaintiff's *Motion for Judgment on the Pleadings* is ALLOWED and Defendant's *Motion to Affirm* is DENIED.

### II. Background

#### A. Facts

Plaintiff was born in 1982 and has a high-school degree.[1] He previously worked as a supermarket stocker at Stop and Shop, until he was terminated on November 30, 2004.[2] He also worked as a sales associate at a General Nutrition Center from April to June 2006 but left that position due to his medical condition.[3] Plaintiff alleges that he became disabled and unable to work on or about November 30, 2004 and has been unable to work since then.[4]

From February to mid-June 2005, Plaintiff was incarcerated because he was "in trouble with the law ... for pain medications."[5]

#### B. Medical History

In 2001, 2002, and early 2004, Plaintiff underwent three separate detoxifications from an opiate addiction.[6] On July 2, 2004, Plaintiff began to see primary care

---

1. Tr. 780, 783 [# 8–2].

2. Tr. 71, 78 [# 8–6]; Tr. 143 [# 8–7]; Tr. 782, 783–84, 795 [# 8–2].

3. Tr. 71, 78, 85 [# 8–6]; Tr. 143 [# 8–7].

4. Pl.'s Mem. Law Supp. His Mot. J. Pleadings, 1 [# 13] [hereinafter Pl.'s Mem.]; *see* Tr. 781 [# 8–2].

5. Tr. 435 [# 8–11]; Tr. 587 [# 8–13].

6. Tr. 387 [# 8–10].

physician Dr. Andrew Cutler.[7] On July 6, 2004, Plaintiff, referred by Dr. Cutler, went to Mount Auburn Hospital Prevention and Recovery Center.[8] There, he complained of back pain, was diagnosed with polysubstance dependence, and received a Global Assessment of Functioning ("GAF") of 45.[9]

At a follow-up appointment to Plaintiff's detoxification on November 1, 2004, Plaintiff received a GAF of 35.[10]

On September 24, 2004, Plaintiff saw orthopedist Dr. Gregory Brick, who advised that Plaintiff undergo an MRI scan to rule out disc herniation or other pathology.[11]

One month later, Plaintiff went to the emergency department at Newton–Wellesley Hospital to undergo detoxification from heroin and cocaine.[12] At the hospital, he was diagnosed with opioid and cocaine dependence and depression and received a GAF of 35.[13]

Two weeks later, MRIs of Plaintiff's spine indicated moderate abnormalities.[14]

On June 23, 2005, Plaintiff told Dr. Cutler that he had been substance-free since his incarceration and that, because of his ongoing pain, he did not feel that he could work.[15] Dr. Cutler referred Plaintiff for mental health treatment.[16]

Four months later, Plaintiff complained to Dr. Brick of increased back and neck pain.[17] On examination, Dr. Brick observed three positive mechanical Waddell signs.[18] Dr. Brick reported that Plaintiff's "motor exam [wa]s quite inconsistent" and that there was "no convincing evidence of neuropathic motor weakness," although he also noted that it was "difficult to [assess] his motor strength."[19] Cervical, thoracic, and lumbar spine x-rays taken that day were all unremarkable.[20] Dr. Brick prescribed Ultracet.[21]

---

7. Tr. 580–81 [# 8–13].

8. Tr. 387 [# 8–10].

9. Tr. 388 [# 8–11]. A GAF of 41 to 50 indicates serious symptoms such as suicidal ideation, or any serious impairment in social, occupational, or school functioning, such as having no friends or being unable to keep a job. Def.'s Mem. Law Supp. Def.'s Mot. Affirm Comm'r's Decision, 5 n. 2 [# 18] [hereinafter Def.'s Mem.] (citing Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) [hereinafter DSM–IV] ).

10. Tr. 384 [# 8–10]. A GAF of 31 to 40 indicates some impairment in reality testing, communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. Def.'s Mem., 5 n. 3 [# 19] (citing DSM–IV at 34).

11. Tr. 135 [# 8–7].

12. Tr. 473–74, 478–79 [# 8–11].

13. Tr. 473–74, 478–79 [# 8–11].

14. Tr. 132–34 [# 8–7]. Specifically, the MRIs showed moderate right foraminal narrowing at C4–5 and mild left foraminal narrowing at C5–6, a 2mm posterior disc herniation at T5–6, mild triangulation of the thecal sac at L3–4, and abnormal high signal in the right sacral ala adjacent to a lumbarized S1 vertebral body, with incomplete fusion of the sacral ala, likely due to altered biomechanics. Tr. 132–34 [# 8–7].

15. Tr. 587 [# 8–13].

16. Tr. 587 [# 8–13].

17. Tr. 127 [# 8–7]; Tr. 439 [# 8–11].

18. Tr. 127 [# 8–7]; Tr. 439 [# 8–11]. Waddell signs are "indications of non-organic causes of back pain; that is, signs that a patient's reported pain has a behavioral origin." *Bazile v. Apfel*, 113 F.Supp.2d 181, 187 n. 2 (D.Mass.2000). Normally, at least three Waddell signs must be present to consider the signs relevant to credibility. *Id.*

19. Tr. 127 [# 8–7]; Tr. 439 [# 8–11].

20. *See* Tr. 124–25, 129–31 [# 8–7]; Tr. 441–42 [# 8–11].

On May 3, 2006, Plaintiff reported to Dr. Cutler that he had been working recently and felt that the pain and parasthesias in his extremities was worsening because he was on his feet.[22] On May 10, 2006, Dr. Cutler prescribed Plaintiff Percocet and Neurontin.[23]

On July 7, 2006, Plaintiff was in a car that was rear-ended.[24] At the emergency department of Mount Auburn Hospital, Plaintiff complained of back pain, and his gait was erratic.[25] After a cervical spine x-ray indicated normal alignment, Plaintiff was discharged with anti-inflammatory and pain medication.[26] On July 14, 2006, Plaintiff followed up with Dr. Cutler, who diagnosed strains of Plaintiff's upper back and right shoulder.[27] Dr. Cutler scheduled physical therapy for the mid-back pain and referred Plaintiff to the orthopedic group at Mount Auburn Hospital for his shoulder issues.[28]

On August 1, 2006, Plaintiff attended physical therapy.[29] On October 16, 2006, Plaintiff saw Dr. Cutler, who found that Plaintiff's neck had "generally good range of motion" and deferred the rest of the exam.[30] On October 17, 2006, Plaintiff resumed physical therapy.[31] On October 20, he reported no change in pain levels but an increase in strength and postural awareness.[32] On December 20, 2006, Plaintiff was discharged from outpatient physical therapy, after being seen eight times between October 17 and November 20, 2006, because he did not schedule follow-up appointments.[33] On February 5, 2007, Dr. Cutler noted that Plaintiff had not pursued his earlier orthopedic or mental health referrals.[34]

On February 21, 2007, Plaintiff was admitted to Mount Auburn Hospital in a lethargic and non-verbal condition due to a presumed drug overdose, and his urine drug screen was positive for benzodiazepines, cocaine, and marijuana.[35] He was discharged the next day in stable condition.[36]

On March 7, 2007, after he slipped and fell, Plaintiff went to Mount Auburn Hospital emergency department, where he reported pain in his ribs and right elbow.[37] The attending physician found tenderness at several places on Plaintiff's body.[38] Plaintiff was discharged with a prescription for tramadol and ibuprofen.[39]

On March 23, 2007, Plaintiff began substance abuse treatment at the Prevention and Recovery Center at Mount Auburn Hospital, attending weekly therapy with

21.  Tr. 127 [# 8–7]; Tr. 440 [# 8–11].

22.  Tr. 590 [# 8–13].

23.  Tr. 592 [# 8–13].

24.  Tr. 364 [# 8–10].

25.  Tr. 364–65 [# 8–10].

26.  Tr. 365, 368 [# 8–10].

27.  Tr. 236 [# 8–8].

28.  Tr. 237 [# 8–8].

29.  Tr. 358 [# 8–10]; Tr. 595 [# 8–14].

30.  Tr. 595 [# 8–14].

31.  Tr. 349, 352 [# 8–10]; Tr. 596 [# 8–14].

32.  Tr. 349, 352 [# 8–10]; Tr. 596 [# 8–14].

33.  Tr. 342, 352 [# 8–10].

34.  Tr. 230 [# 9].

35.  Tr. 324–25 [# 8–10].

36.  Tr. 320 [# 8–9].

37.  Tr. 316 [# 8–9].

38.  Tr. 317–19 [# 8–9].

39.  Tr. 316–17 [# 8–9].

Marguerite Waterman, LICSW, LADCI, and Alcoholics Anonymous ("AA")/Narcotics Anonymous ("NA") meetings four times a week.[40] At intake, Plaintiff was diagnosed with polysubstance dependence, post-traumatic stress disorder ("PTSD"), and depression and was given a GAF of 55.[41]

On April 18, 2007, Plaintiff told Waterman that he had consumed two drinks the day before but had used no drugs for six weeks and that he had attended AA or NA.[42] On April 25, 2007, Plaintiff reported no alcohol use, although he had smoked marijuana a few days before.[43] On May 9, 2007, Plaintiff reported abstinence, although he was not attending AA or NA.[44]

On May 10, 2007, the car Plaintiff was in was rear-ended, and he went to Caritas Saint Elizabeth's Medical Center, where CT scans of his body indicated no new pathology.[45] He was diagnosed with myofascial strain and discharged as stable, but he complained of pain above his chronic baseline pains, including in his arms and legs, and he said he had doubled his Percocet usage.[46] He agreed to return to the prescribed dose after Dr. Cutler discussed the use of narcotic pain medication and gave him the phone number for a spine

center for another opinion.[47] A May 16, 2007 urine screen was negative for opiates but positive for cocaine.[48] May 24, 2007 MRIs of Plaintiff's spine "turned out well," despite his complaints of paresthesias of the arms and legs.[49]

On May 23, 2007, Plaintiff told Waterman that over the weekend he had used marijuana that he later found out was laced with cocaine, and that he would be moving in with a friend and his family.[50] On June 6, 2007, Plaintiff reported abstinence for two weeks and said that his pain medications were not very helpful, even though he was taking six to eight Percocet per day.[51] On June 13, 2007, Plaintiff said that he ran out of pain medication and felt good emotionally but had tried lifting light weights and was soon in pain.[52] On June 20, 2007, Plaintiff said that he felt stronger, having taken some walks and used light weights, and was awaiting referral to a spine clinic.[53] He reported managing his pain pretty well and said he regretted losing his job at GNC and hoped to return sometime in the near future.[54]

On June 20, 2007, Plaintiff and his father went to the emergency room at Newton–Wellesley Hospital after a verbal altercation.[55] Plaintiff's cervical spine, neck, and

---

**40.** Tr. 138 [# 8–7].

**41.** Tr. 314 [# 8–9]. A GAF of 51 to 60 indicates moderate symptoms, such as flat affect; occasional panic attacks; or moderate difficulty in social, occupational, or school functioning, such as having few friends or conflicts with peers or coworkers. Def.'s Mem., 8 n. 5 [# 19] (citing DSM–IV at 34).

**42.** Tr. 308 [# 8–9].

**43.** Tr. 307 [# 8–9].

**44.** Tr. 306 [# 8–9].

**45.** Tr. 218 [# 8–7]; Tr. 226 [# 8–8]; Tr. 448–50 [# 8–11].

**46.** Tr. 226–27 [# 8–8]; Tr. 451 [# 8–11].

**47.** Tr. 226–27 [# 8–8].

**48.** Tr. 248 [# 8–9].

**49.** Tr. 606–10 [# 8–14].

**50.** Tr. 304 [# 8–9].

**51.** Tr. 304 [# 8–9].

**52.** Tr. 303 [# 8–9].

**53.** Tr. 302 [# 8–9].

**54.** Tr. 302 [# 8–9].

**55.** Tr. 507–17 [# 8–12].

back were normal on examination.[56] His blood alcohol level ("BAL") was 215, and he admitted to having used cocaine within the previous twenty-four hours.[57] The next morning, Plaintiff and his father told psychiatric triage clinician George Ingham, LICSW, that Plaintiff had not used heroin, cocaine, or other street drugs "in years" but he periodically abused alcohol.[58] Ingham assessed Plaintiff as having fair insight and judgment, and although his mood was depressed, he had no hallucinations, delusions, or symptoms of thought disorder.[59] Plaintiff did not meet the criteria for admission and was discharged with diagnoses of depression and polysubstance abuse, with a GAF of 45.[60]

The next day, Dr. Cutler noted that Plaintiff's physical and mental illness issues had not changed much.[61] Dr. Cutler also noted that Plaintiff saw a therapist weekly, would have his first meeting with a psychotherapist the next day, that he was "remaining clean and sober these days," and that he was attending AA and NA meetings regularly.[62] On June 22, 2007, psychiatrist Halyna Vitagliano evaluated Plaintiff, and Plaintiff stated that he had used alcohol the day before.[63] Dr. Vitagliano diagnosed Plaintiff with depression and polysubstance abuse and gave him a GAF of 50.[64] Dr. Vitagliano indicated that Plaintiff's current use made it difficult to

assess psychiatric symptoms on that visit, but she increased Plaintiff's dosage of Celexa and prescribed trazodone.[65]

On June 27, 2007, Plaintiff reported that the previous night and over the previous few days he had "a few drinks."[66] Waterman noted that Plaintiff was minimizing his drinking but that he was resistant to being totally abstinent.[67] In July and August 2007, Plaintiff reported continued abstinence.[68] He also reported constant back and neck pain and said that he was taking up to eight Percocet a day without much relief.[69]

On August 9, 2007, Plaintiff reported to consulting psychiatrist Dr. Michael Bohnert that he last used ("a couple of beers") a week before and that he last used cocaine "about six months or more ago," explaining he had six months clean "except for the beers two weeks ago."[70] Plaintiff stated that he attended AA and NA between two to four days a week and counseling at Mount Auburn Hospital in the "prevention and recovery" program; that medications helped slightly, taking "some of the edge off of the anxiety"; and that his concentration was "a little off here and there."[71] Dr. Bohnert ruled out PTSD and diagnosed Plaintiff with depressive disorder, moderately severe, and personality disorder with antisocial traits, with a reported history of opioid depen-

56. Tr. 508 [# 8–12].

57. Tr. 507, 509 [# 8–12].

58. Tr. 499–500 [# 8–12].

59. Tr. 500 [# 8–12].

60. Tr. 501 [# 8–12].

61. Tr. 224 [# 8–8].

62. Tr. 224 [# 8–8].

63. Tr. 296 [# 8–9].

64. Tr. 299 [# 8–9].

65. Tr. 299 [# 8–9].

66. Tr. 295 [# 8–9].

67. Tr. 295 [# 8–9].

68. Tr. 286, 290–94 [# 8–9].

69. Tr. 286, 290–94 [# 8–9].

70. Tr. 144 [# 8–7].

71. Tr. 144–45 [# 8–7].

dence and cocaine, alcohol, and polydrug abuse.[72] Bohnert opined that Plaintiff's prognosis would be more favorable with strict, extensive abstinence; continued outpatient substance abuse treatment; and ongoing psychiatric and psychopharmacologic treatment.[73]

On August 28, 2007, Plaintiff complained of significant pain to Dr. Vitagliano when Percocet and Ativan were discussed and was unwilling to consider changes in his medication.[74] He initially said that his last use of alcohol was two weeks before but later said that it was on his birthday approximately one month prior.[75] Dr. Vitagliano noted that Plaintiff's history was variable regarding alcohol use.[76] Per Plaintiff's request, Dr. Vitagliano submitted a "disability form." [77]

On August 29, 2007, Plaintiff reported that his pain medication and Ativan were stolen and that he had filed a police report.[78] He reported abstinence, but a drug screen collected on that day was positive for cannabinoids, opiods, and benzodiazepine.[79] On September 5, 2007, Plaintiff admitted to drinking alcohol the week before, which he said was the third time he had consumed alcohol since July 22, 2007.[80] Five days later, an ambulance took Plaintiff, who had a BAL of 135, to Carney Hospital for psychiatric admission.[81] Plaintiff admitted that he: had an argument with a friend and "smash[ed] a bottle over his head"; smoked marijuana once a month; drank alcohol twice a week; and used cocaine four days before.[82] Plaintiff was diagnosed with alcohol intoxication and heroin dependence in remission and given a GAF of 35.[83] The next day, psychiatrist Dr. Sean Marker discharged him and gave him a GAF of 55.[84] On September 13, 2007, Plaintiff admitted to Dr. Vitagliano that he had used marijuana in the previous week and recently abused alcohol.[85] Dr. Vitagliano noted that Plaintiff continued to minimize the impact of these substances and gave Plaintiff a GAF of approximately 50.[86]

One day later, Plaintiff, feeling helpless, hopeless, and depressed, was admitted again, with a GAF of 35 to 40.[87] He denied any substance use and a drug screen on that date returned negative results for alcohol and illicit substances but positive for opiates and benzodiazapene.[88] During his hospital stay, Plaintiff received treatment with Trileptal, Seroquel, Klonopin, and Celexa.[94] On re-evaluation ten days later, Plaintiff appeared much calmer and less irritable and stated that he believed he had benefitted from the medi-

72. Tr. 146–47 [# 8–7].

73. Tr. 146–47 [# 8–7].

74. Tr. 284 [# 8–9].

75. Tr. 284 [# 8–9].

76. Tr. 284 [# 8–9].

77. Tr. 259, 284 [# 8–9].

78. Tr. 283 [# 8–9].

79. Tr. 278, 283 [# 8–9]; Tr. 613 [# 8–14].

80. Tr. 277 [# 8–9].

81. Tr. 542–43 [# 8–12].

82. Tr. 542–43 [# 8–12].

83. Tr. 543 [# 8–12].

84. Tr. 544–45 [# 8–13].

85. Tr. 270 [# 8–8].

86. Tr. 270 [# 8–8].

87. Tr. 186, 187, 216–17 [# 8–7].

88. Tr. 186, 216–17 [# 8–7].

94. Tr. 189 [# 8–7].

cation changes.[95] Dr. Marker discharged him that day with diagnoses of bipolar disorder, PTSD, a history of polysubstance abuse, and an improved GAF of 60, and an after-care plan to continue treatment on an outpatient basis.[96]

Dr. Vitagliano later noted that Plaintiff was not functioning well on an outpatient basis and required a higher level of care.[97] She closed his case, with the potential to re-open pending successful completion of a day treatment program and changes in his living situation.[98] On October 1, 2007, Plaintiff reported that he had not used cocaine in four to five months but occasionally used alcohol.[99] On October 2, 2007, he reported tolerating medication well without adverse side effects.[100] In the following days, he reported that he was tolerating his medications well and maintaining stability.[101]

On October 19, 2007, Plaintiff told Dr. Cutler he felt he was doing better with the addition of new medication and that he continued to attend daily outpatient programs.[102] On December 3, 2007, Plaintiff told Dr. Cutler that he had seen a back specialist who recommended physical therapy and possibly a cortisone injection, and that Plaintiff felt his condition had worsened after additional motor vehicle accidents over the previous year and a half.[103]

On January 7, 2008, Dr. Cutler found nothing remarkable about December 2007 MRIs of Plaintiff's spine and recommended that Plaintiff pursue physical therapy.[104] On March 17, 2008, Plaintiff told Dr. Cutler that he had not followed through on physical therapy, and Dr. Cutler noted that Plaintiff had not acted on a referral to an orthopedist for his shoulder.[105] On April 17, 2008, Plaintiff told Dr. Cutler that he was not sure if the Neurontin was making a difference, and Dr. Cutler increased the dosage.[106] On May 12, 2008, Plaintiff said that he tried to do some manual labor, but he could not continue because he was in pain.[107]

On November 5, 2008, Dr. Cutler noted that Plaintiff continued to take and tolerate his medications for health conditions, with the exception of Seroquel, which he stopped because it made him drowsy.[108] Plaintiff mentioned that he was re-starting mental health treatment, and Dr. Cutler added oxycontin as a long-acting narcotic for nighttime.[109] On January 7, 2009, Plaintiff told Dr. Cutler that his pain was more pronounced after doing some carpentry-type work, and he asked for extra Percocet and oxycontin on a regular basis.[110]

On January 16, 2009, Plaintiff was in a car accident and reported immediate neck pain.[111] At the Newton–Wellesley Hospi-

95. Tr. 190 [# 8–7].

96. Tr. 181, 190–91 [# 8–7].

97. Tr. 261 [# 8–8].

98. Tr. 261 [# 8–8].

99. Tr. 550 [# 8–13].

100. Tr. 551 [# 8–13].

101. Tr. 203 [# 8–7].

102. Tr. 614 [# 8–14].

103. Tr. 616 [# 8–14].

104. Tr. 238–42 [# 8–8]; Tr. 619 [# 8–14].

105. Tr. 621 [# 8–14].

106. Tr. 623, 627 [# 8–14].

107. Tr. 625 [# 8–14].

108. Tr. 629 [# 8–14].

109. Tr. 629–30 [# 8–14].

110. Tr. 631 [# 8–14].

111. Tr. 405 [# 8–11].

tal emergency room, Plaintiff received analgesics and was referred to the Newton–Wellesley Hospital spine clinic with a diagnosis of concussion, lumbar strain, and neck strain.[112]

On February 25, 2009, Plaintiff went to Carney Hospital suffering from depression, anxiety, and auditory hallucinations, and he was admitted with a GAF score of 30.[113] He said that he had relapsed on cocaine six months before, that he had not used any substances since, and that he quit Seroquel several months before.[114] On March 2, 2009, Plaintiff was discharged with adjusted medications and improved condition, with GAFs of 60 or 65.[115]

Less than a week later, Plaintiff was again admitted for psychiatric care at Carney Hospital.[116] He reported last drinking a few months before and last having used cocaine four months before and was diagnosed with polysubstance dependence and mood disorder and given a GAF of 30.[117] Upon discharge on March 18, 2009, Plaintiff said that he felt "much better" and was excited for discharge, and he was given a GAF of 50.[118]

On April 10, 2009, Plaintiff told Dr. Cutler that he had not yet scheduled a follow-up appointment with his outpatient thera-

pist, and Dr. Cutler changed his prescription from oxycontin to oxycodone, because the former was not covered by Plaintiff's insurance.[119]

On January 28, 2010, Plaintiff began seeing Carol Slade, LICSW.[120] Plaintiff told Slade he had not used alcohol since December 14, 2009 and focused on physical complaints, and Slade opined that his mood was not stable, evincing depression and anxiety.[121]

On March 3, 2010, Plaintiff reported testing positive for amphetamines, and on April 8, 2010, his drug screen was positive for benzodiazapenes and negative for illicit substances.[122] On April 21, 2010, Plaintiff stated that he was compliant with his medications and remained abstinent from drugs and alcohol, that he had passed a urine drug screen with his parole officer, and that he and his father "take care of each other." [123] On April 29, 2010, Plaintiff said he could not function without his pain medications, although two weeks later he said they were "helpful to a point." [124]

C. *Opinion Evidence at Issue on Appeal*

1. *Dr. Cutler—Primary Care Physician*

In a November 26, 2007 letter, Dr. Cutler stated that Plaintiff had chronic back

**112.** Tr. 408 [# 8–11].

**113.** Tr. 557–58 [# 8–13]. A GAF of 21 to 30 indicates behavior that is considerably influenced by delusions, hallucinations, serious impairment in communication or judgment, or inability to function in almost all areas. Def.'s Mem., 14 n. 7 [# 19] (citing DSM–IV at 34).

**114.** Tr. 557 [# 8–13].

**115.** Tr. 562, 570 [# 8–13]. A GAF of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social stressors and no more than a slight impairment in social, occupational, or school functioning. Def.'s Mem., 14 n. 8 [# 19] (citing DSM–IV at 34).

**116.** Tr. 571 [# 8–13].

**117.** Tr. 571–72 [# 8–13].

**118.** Tr. 575 [# 8–13].

**119.** Tr. 633 [# 8–14].

**120.** Tr. 658–65 [# 8–14].

**121.** Tr. 647–51, 658, 667–68 [# 8–14].

**122.** Tr. 656, 668 [# 8–14].

**123.** Tr. 647 [# 8–14].

**124.** Tr. 648–49 [# 8–14].

and neck pains and other "nerve symptoms" going into the extremities; that Plaintiff had had "significant evaluations over time," including seeing different specialists; and that Plaintiff was trying to manage his symptoms with analgesic therapy.[125] He also stated that Plaintiff had been treated for chronic mental health issues, including anxiety and depression, with some recent inpatient psychiatric admissions, and that his medication was adjusted to treat presumed bipolar disorder.[126] Dr. Cutler concluded that because these health issues had rendered Plaintiff unable to work in any capacity, Plaintiff was disabled.[127]

On October 28, 2008, Dr. Cutler wrote another letter on Plaintiff's behalf, stating that Plaintiff's symptoms prevented him from lifting weights or performing usual activities (standing, bending, crouching, etc.) for any sustained period of time.[128] On September 8, 2009, Dr. Cutler wrote a third letter, stating that Plaintiff had been treated for both PTSD and substance abuse problems, that Plaintiff had been substance free "for years," that he attended drug counseling weekly, that he attended AA and NA on a regular basis, and that he submitted to random drug screens.[129]

On March 16, 2010, Dr. Cutler submitted a Psychiatric/Psychological Impairment Questionnaire,[130] a Multiple Impairment Questionnaire,[131] and a signed statement that Plaintiff was totally dis-

abled without consideration of any past or present drug and/or alcohol use, and that drug and/or alcohol use was not a material cause of .Plaintiff's disability.[132] In his psychological evaluation, Dr. Cutler assessed multiple marked factors that would restrict Plaintiff's ability to perform competitive work activity.[133] Dr. Cutler's physical evaluation was similarly restrictive, including assessments that Plaintiff could sit, stand, or walk only up to one hour per day; that pain constantly interfered with Plaintiff's attention and concentration; and that Plaintiff was incapable of even low-stress jobs.[134] Dr. Cutler opined that these limitations had existed since Plaintiff's 2001 motor vehicle accident.[135]

### 2. Dr. Marker—Treating Psychiatrist

In an October 11, 2007 letter, Dr. Marker stated that Plaintiff had struggled with undiagnosed bipolar disorder for several years, culminating in severe social and occupational dysfunction, which met the criteria for disability.[136] Dr. Marker also noted that Plaintiff was actively engaged in treatment in the acute partial hospitalization program at Carney Hospital.[137] On March 2, 2009, Dr. Marker wrote another letter noting that Plaintiff's psychiatric hospitalization, from February 25, 2009 to March 2, 2009, was his third for unstable mood, and that Plaintiff was unable to work in any capacity, could not function in a social setting, and was "essentially dis-

---

**125.** Tr. 468 [# 8–11].

**126.** Tr. 468 [# 8–11].

**127.** Tr. 468 [# 8–11].

**128.** Tr. 469 [# 8–11].

**129.** Tr. 470 [# 8–11].

**130.** Tr. 415–22 [# 8–11].

**131.** Tr. 424–31 [# 8–11].

**132.** Tr. 423 [# 8–11].

**133.** Tr. 416–22 [# 8–11].

**134.** Tr. 426–29 [# 8–11].

**135.** Tr. 430 [# 8–11].

**136.** Tr. 556 [# 8–13].

**137.** Tr. 556 [# 8–13].

abled" due to his mental disorders and required ongoing outpatient treatment.[138] Finally, Dr. Marker wrote a third letter, in which he opined that Plaintiff met the disability criteria due to mental and physical disorders and required ongoing outpatient treatment.[139]

### 3. *Ms. Slade—LICSW*

In July 2010, Ms. Slade filled out a Psychiatric/Psychological Impairment Questionnaire, reflecting diagnoses of bipolar disorder and polysubstance dependence (in remission) with a GAF of 50 and a fair prognosis and noting that Plaintiff had not undergone any psychiatric hospitalizations since she had begun seeing him.[140] She stated that Plaintiff consistently reported that his pain limited his physical activity, which appeared to affect his mood with irritability and frustration, and she estimated that he would likely be absent from work two to three times per month.[141]

### D. *Plaintiff's Testimony*

At his hearing, Plaintiff testified he had tried to work a few times since his alleged onset date, acting as a "gopher" for a plumber friend, but for "a total of ten times" for only "a few hours a day," and he had a hard time doing it.[142] Plaintiff further testified that he could not work because he was "very depressed, very stressed out" and constantly in severe pain, and he felt better only when he laid down and took medication, which "[took] the edge off."[143] His physical problems started in 2001, when he was hit by a car while riding a bicycle, and although he returned to work afterward, he was "self-medicating a lot," and being involved in several other car accidents increased his pain.[144]

Plaintiff testified that his pain was throbbing, aching, constant, and chronic; that it went through his entire spine and all of his extremities; that several times per day he had shooting pains down his legs; and that three to ten times a day he had shooting pain down his arms with numbness in his fingers that lasted for five to forty-five minutes and was triggered by normal activities like picking up a cup of coffee.[145] He said that he had tried physical therapy three years before but that it made him feel worse; that within the previous three months he had epidural injections, which had taken away ten to twenty percent of the shooting pain for a few weeks; and that he had not received any other treatment aside from his medications, which include Oxycodone, Percocet, Lyrica, Celebrex, and Klonopin.[146] Plaintiff said the medications let him do more activities, like getting something to eat, helping his dad, and keeping the house clean, which he could do once a month with breaks and more medications, but that it was "very tough" and took all day.[147]

Plaintiff testified that he could not sit still but was capable of sitting in one place for "40 minutes, 25 minutes"; that he could stand in one place for "10 minutes tops" but had to move; that he could "put weight from side to side" and walk some blocks before having to sit and rest for five

138. Tr. 560 [# 8–13].

139. Tr. 578 [# 8–13].

140. Tr. 636, 638 [# 8–14].

141. Tr. 638, 643 [# 8–14].

142. Tr. 781–82 [# 8–2].

143. Tr. 783 [# 8–2].

144. Tr. 785–86 [# 8–2].

145. Tr. 786–87 [# 8–2].

146. Tr. 788–89 [# 8–2].

147. Tr. 790 [# 8–2].

to ten minutes.[148] He said that his mind raced all the time; that he was very depressed, anxious, and stressed; that he had a lot of anger issues; and that he took medication for these problems, which "barely" helped.[149] He did not think he could deal with people in a normal work setting on a regular basis because he was afraid of being around people and was miserable, and that these factors had worsened since he stopped working.[150]

Plaintiff also stated that family stress was "killing" him, that he used to love weight lifting but could no longer do it, that he had a hard time feeling guitar strings and no longer played, that he spent most of the day (estimated at eighty to eighty-five percent) lying down and watching TV, and that he barely slept due to pain.[151]

### E. Procedural History

On June 12, 2007, Plaintiff, alleging disability since November 30, 2004, filed applications for Social Security Benefits and Supplemental Security Income payments.[152] On September 13, 2007, both applications were denied initially, and on September 9, 2008, a Federal Reviewing Official denied the applications.[153]

On November 6, 2008, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and ALJ Alan Mackay held a hearing on July 26, 2010 on the denial of Plaintiff's application.[154] On August 18, 2010, ALJ Mackay found that Plaintiff was not disabled and thus not entitled to Social Security Disability Benefits.[155]

On September 23, 2010, Plaintiff filed a request with the Appeals Council to reconsider ALJ Mackay's decision, and on April 25, 2012, the Appeals Council denied the request for review of the ALJ's decision.[156]

On June 19, 2012, Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g).[157]

### III. Discussion

#### A. Standard of Review

■ When a district court reviews a final decision of the Commissioner of Social Security ("Commissioner"), it has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ..., with or without remanding the cause for a hearing," but the court may not disturb the Commissioner's findings if they are supported by "substantial evidence."[158] Substantial evidence, however, is "more than a scintilla of evidence that a reasonable person could find to support the result."[159]

---

**148.** Tr. 791 [# 8–2].

**149.** Tr. 792 [# 8–2].

**150.** Tr. 792 [# 8–2].

**151.** Tr. 793–94 [# 8–2].

**152.** Pl.'s Mem., 1 [# 13]; Def.'s Mem., 1 [# 19].

**153.** Pl.'s Mem., 1–2 [# 13]; Def.'s Mem., 2 [# 19].

**154.** Pl.'s Mem., 2 [# 13]; Def.'s Mem., 2 [# 19].

**155.** Pl.'s Mem., 2 [# 13]; Def.'s Mem., 2 [# 19]; see Tr. 18–31 [# 8–2].

**156.** Def.'s Mem., 2 [# 19]; see Pl.'s Mem., 2 [# 13].

**157.** See Compl. [# 1]. There is no dispute that Plaintiff has exhausted his administrative remedies.

**158.** 42 U.S.C. § 405(g).

**159.** Burke v. Astrue, No. 09–11514–JLT, 2010 WL 4181145, at *4, 2010 U.S. Dist. LEXIS 111593, at *12 (D.Mass. Aug. 6, 2010) (quot-

Substantial evidence exists only if " 'a reasonable mind, reviewing evidence in the record as a whole, could accept it as adequate to support the Commissioner's conclusion.' " [160] Even in the presence of substantial evidence, however, a court may review conclusions of law [161] and invalidate findings of fact that are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." [162]

### B. Analysis

The SSA defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." [163] A person qualifies as disabled if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work

exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.[164]

To determine more specifically whether a person qualifies as disabled, the SSA has created a five-step evaluation process.[165] An ALJ must determine sequentially (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals a listed impairment; [166] (4) whether the claimant can perform past relevant work; [167] and (5) whether any jobs exist in the national economy that the claimant can perform given the claimant's residual functional capacity ("RFC"), age, education, and work experience.[168]

▇▇▇ For each of the first four steps, the claimant bears the burden of showing that he or she is disabled.[169] If the claimant establishes that he or she can no longer perform his or her past relevant work, the burden shifts to the Commissioner to show that the claimant is able to engage in substantial gainful activity.[170] If the Com-

ing *Musto v. Halter,* 135 F.Supp.2d 220, 225 (D.Mass.2001)).

**160.** *Musto,* 135 F.Supp.2d at 225 (quoting *Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir.1991)).

**161.** *Slessinger v. Sec'y of Health & Human Servs.,* 835 F.2d 937, 939 (1st Cir.1987) (citing *Thompson v. Harris,* 504 F.Supp. 653, 654 (D.Mass.1980)).

**162.** *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999) (citing *Da Rosa v. Sec'y of Health & Human Servs.,* 803 F.2d 24, 26 (1st Cir.1986) (per curiam); *Ortiz,* 955 F.2d at 769).

**163.** 42 U.S.C. § 423(d)(1)(A).

**164.** *Id.* § 423(d)(2)(A); *see also Deblois v. Sec'y of Health & Human Servs.,* 686 F.2d 76, 79 (1st Cir.1982).

**165.** *See* 20 C.F.R. § 404.1520; *Goodermote v. Sec'y of Health & Human Servs.,* 690 F.2d 5, 6–7 (1st Cir.1982).

**166.** The regulations contain a list of impairments that are disabling per se. *See* 20 C.F.R. § 404.1520(d).

**167.** The regulations define "past relevant work" as work the claimant has done in the last fifteen years. *Id.* § 404.1560(b)(1).

**168.** *Id.* § 404.1520(a)(4)(i-v).

**169.** *See, e.g., Goodermote,* 690 F.2d at 7.

**170.** *Rohrberg v. Apfel,* 26 F.Supp.2d 303, 306–07 (D.Mass.1998).

missioner is able to make such a showing, the claimant is not disabled.[171]

Here, the ALJ denied Plaintiff's claim for total disability. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 2004.[172] At step two, the ALJ found that Plaintiff had the following severe impairments: depression and neck and back impairments due to multiple motor vehicle accidents.[173] At step three, the ALJ found that none of Plaintiff's severe impairments met or medically equaled one of the impairments listed in the regulations.[174] At step four, the ALJ found that Plaintiff was "unable to perform any past relevant work." [175] Finally, at step five, considering Plaintiff's "age, education, work experience, and residual functional capacity," the ALJ determined that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." [176] Specifically, the ALJ determined that Plaintiff has "the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)." [177]

### 1. *Weight of the Medical Evidence*

When determining Social Security benefits, an ALJ generally gives more weight to opinions from the claimant's treating physicians, because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[178]

An ALJ will generally give "controlling weight" to a treating physician's opinion on the nature and severity of the claimant's impairment if the ALJ finds that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." [179]

If an ALJ does not give controlling weight to a treating physician's opinion,

---

**171.** *See, e.g., Goodermote*, 690 F.2d at 7.

**172.** Tr. 20 [# 8–2].

**173.** Tr. 20 [# 8–2].

**174.** Tr. 21 [# 8–2].

**175.** Tr. 29 [# 8–2]. Specifically, the ALJ found that Plaintiff was unable to perform his past work as a supermarket stocker. Tr. 29 [# 8–2].

**176.** Tr. 30 [# 8–2].

**177.** Tr. 22 [# 8–2]. The ALJ noted several of Plaintiff's limitations: "he can occasionally climb, balance, stoop, kneel, crouch or crawl; he is limited in his ability to reach; and he must avoid concentrated exposure to extreme cold and hazards, such as dangerous machinery and unprotected heights. As to mental limitations, [Plaintiff] can understand, re-

member and carry out simple instructions; he can make judgments on simple work related decisions; he is mildly limited on [sic] his ability to understand, remember, carry out, and make judgments on complex work related instructions; he is moderately limited in his ability to interact appropriately with the general public; he is mildly limited in his ability to interact appropriately with supervisors and coworkers; and he is mildly limited in his ability to respond to the usual work situations and to engage in a routine work setting." Tr. 22 [# 8–2].

**178.** 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

**179.** *Id.; see* SSR 96–2p (July 2, 1996) ("If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.").

the ALJ considers six enumerated factors in determining the weight to be given the treating physician's opinion.[180] Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence in support of the physician's medical opinion; (4) the consistency of the medical opinions reflected in the record as a whole; (5) whether the treating physician is a specialist in the area in which he or she renders his or her opinion; and (6) other factors that tend to support or contradict the physician's opinion.[181] The ALJ must provide "good reasons" for any weight that he or she decides to give to a treating physician's opinion.[182] The relevant consideration is whether the ALJ's reasoning is sufficiently clear for a court to discern it.[183] Moreover, even if the opinion of a treating physician does not meet the test for controlling weight, such an opinion is often still entitled to deference from the ALJ.[184]

The ALJ " 'must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's opinion on the basis of contradictory medical evidence, not on the ALJ's own credibility judgments, speculation or lay opinion.' "[185] Importantly, an "ALJ is not free to substitute his own judgment for uncontroverted medical opinion."[186] And although the regulations vest final decision-making power with the Commissioner rather than with a claimant's physician, an ALJ cannot ignore a medical opinion on disability.[187]

The regulations further define "acceptable medical source."[188] If a source is not an acceptable medical source, an ALJ may not afford the opinion of that source controlling weight.[189] Instead, an ALJ should consider the opinions of non-acceptable medical sources when determining "the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work."[190] An ALJ should use

180. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

181. *Id.* §§ 404.1527(c)(2–6), 416.927(c)(2–6); *see Makuch v. Halter,* 170 F.Supp.2d 117, 125 (D.Mass.2001) (citing *Guyton v. Apfel,* 20 F.Supp.2d 156, 167 (D.Mass.1998)).

182. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Makuch,* 170 F.Supp.2d at 125.

183. *See Green v. Astrue,* 588 F.Supp.2d 147, 155 (D.Mass.2008).

184. SSR 96–2p ("[A] finding that a treating source medical opinion ... is not entitled to 'controlling weight' [does not mean] that the opinion should be rejected.... In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

185. *Murphy v. Astrue,* No. 11–10634–JLT, 2012 WL 1866288, at *12 (D.Mass. Apr. 10, 2012) (quoting *Ambrosini v. Astrue,* 727 F.Supp.2d 414, 425 (W.D.Pa.2010)).

186. *Rose v. Shalala,* 34 F.3d 13, 18 (1st Cir. 1994); *see Nguyen,* 172 F.3d at 35.

187. *See* 20 C.F.R. §§ 404.1527(c)(2), (d), 416.927(c)(2), (d); *see also Bjornson v. Astrue,* 671 F.3d 640, 647–48 (7th Cir.2012) (Posner, J.); *cf. Dedis v. Chater,* 956 F.Supp. 45, 51 (D.Mass.1997) (holding that an ALJ cannot ignore a " 'body of evidence opposed to his view' " (quoting *Diaz v. Sec'y of Health & Human Servs.,* 791 F.Supp. 905, 912 (D.P.R. 1992))).

188. 20 C.F.R. §§ 404.1513, 416.913; *see id.* §§ 404.1527(a)(2), 416.927(a)(2).

189. *Id.* §§ 404.1527(c)(2), 416.927(c)(2).

190. *Id.* §§ 404.1513(d), 416.913(d); *see* SSR 06–03p (Aug. 9, 2006) (dictating that opinions from "other sources" may be used to show the severity of an individual's impairments).

the same factors that he or she uses to determine the weight to be given to a treating source's opinion when determining the weight due to the opinion of a non-acceptable medical source.[191] Although not all of those factors may apply to a non-acceptable medical source, an ALJ cannot ignore entirely the opinion of a non-acceptable medical source.[192]

### a. Treating Physician

▮ Here, the ALJ failed to properly weigh the medical evidence from Plaintiff's treating physician.

With regard to Plaintiff's treating physician, Dr. Cutler, the ALJ first noted that he was "not bound by" Dr. Cutler's opinion regarding Plaintiff's disability.[193] The ALJ continued:

> As for the opinion of Dr. Cutler that the claimant is disabled, the undersigned [administrative law judge] gives it little weight where it is inconsistent with the claimant's residual functional capacity. Although Dr. Cutler has a long-term treatment relationship with claimant, he is not an orthopedic or psychiatric specialist, and his opinion is not supported by the medical evidence of record.[194]

Because the ALJ did not give controlling weight to Dr. Cutler's opinion, the ALJ should have given "good reasons" for instead assigning the opinion "little weight." [195] In fact, the ALJ gave only two reasons for assigning little weight to Dr. Cutler's opinion: that Dr. Cutler is neither orthopedic nor psychiatric specialist, and that Dr. Cutler's opinion was not supported by medical evidence in the record.[196] These two reasons constitute only two of the six enumerated factors that an ALJ must consider in determining the weight to be given a treating physician's opinion.[197] Moreover, with regard to the ALJ's second reason, that Dr. Cutler's opinion was "not supported by the medical evidence of record," the ALJ did not specify what evidence in the record conflicted with Dr. Cutler's opinion.[198]

Further, the ALJ failed to consider the other regulatory factors.[199] All of these other factors likely weigh in favor of crediting Dr. Cutler's opinion with greater than "little" weight. First, Dr. Cutler regularly treated Plaintiff for six years.[200] Second, Dr. Cutler regularly examined Plaintiff, reviewed the results of his medical testing, and prescribed medications to him, evincing a thorough treatment relationship.[201]

191. 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06–03p.

192. See Lopez v. Astrue, No. 10–10045–JLT, 2011 WL 3841912, at *5 (D.Mass. Aug. 25, 2011) ("[A]lthough the ALJ 'is empowered with the discretion to afford less than controlling weight, or even no weight, to the opinion of other [non-medical] sources, the ALJ has a duty to address and discuss the opinion.'" (quoting Saxon v. Astrue, 781 F.Supp.2d 92, 104 (N.D.N.Y. 2011))); Randall v. Astrue, No. 09–11273–NG, 2011 WL 573603, at *10 (D.Mass. Feb. 15, 2011).

193. Tr. 29 [# 8–2] (citing SSR 96–5p).

194. Tr. 29 [# 8–2].

195. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Makuch, 170 F.Supp.2d at 125.

196. See Tr. 29 [# 8–2].

197. See 20 C.F.R. §§ 404.1527(c)(2–6), 416.927(c)(2–6); see also Makuch, 170 F.Supp.2d at 125.

198. Tr. 29 [# 8–2]; see 20 C.F.R. §§ 404.1527(c), 416.927(c).

199. See 20 C.F.R. §§ 404.1527(c)(2–6), 416.927(c)(2–6).

200. See id. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i).

201. See id. §§ 404.1527(c)(2)(ii), 416.927(c)(2)(ii).

Third, there is ample evidence in the record consistent with Dr. Cutler's opinion.[202] For example, Dr. Marker also opined, as Dr. Cutler did, that Plaintiff was disabled.[203] Fourth, much of the evidence in the record appears internally consistent, and, moreover, consistent *with* Dr. Cutler's opinion.[204]

For these reasons, although it was within the ALJ's power to decline to assign controlling weight to Dr. Cutler's opinion, the ALJ should have made his reasoning for ignoring Dr. Cutler's opinion sufficiently clear.[205] This case is remanded so that the ALJ may, among other things, appropriately address Dr. Cutler's opinion.

### b. *Treating Psychiatrist*

■ Unlike his treatment of Dr. Cutler's opinion, the ALJ properly weighed the medical evidence from Plaintiff's treating psychiatrist. The ALJ assigned "great weight" to the opinion and assessment of Plaintiff's treating psychiatrist, Dr. Marker.[206] The ALJ "agree[d] with Dr. Marker's objective findings," but noted that he was not bound by Dr. Marker's opinion regarding Plaintiff's disability.[207] The ALJ was correct that the power to make the final determination of Plaintiff's disability lies with the Commissioner, and the ALJ did not ignore Dr. Marker's opinion.[208]

### c. *Social Worker*

■ The ALJ improperly weighed the evidence from Plaintiff's social worker, Ms. Slade. Under the regulations, Slade is not an "acceptable medical source."[209] Slade's opinion thus is not due controlling weight.[210] The ALJ, however, did not even mention Slade's opinion, let alone discuss the regulatory factors for determining the weight of the opinion of a non-acceptable medical source.[211] The ALJ thus erred by ignoring the opinion of a non-acceptable medical source,[212] and this case is remanded so that the ALJ may, among other things, appropriately address Slade's opinion.

### 2. *Credibility Determination*

■ Because a claimant's pain "may be more severe than indicated by the objective medical evidence, relying *solely* on objective medical evidence in determining credibility is not generally appropriate."[213] A claimant's subjective symptoms "must be evaluated with due consideration for credibility, motivation and medical evidence of impairment."[214] It is "not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credi-

---

202. *See id.* §§ 404.1527(c)(3), 416.927(c)(3).

203. *See supra* Part II(B)-(D).

204. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

205. *See Green*, 588 F.Supp.2d at 155.

206. Tr. 29 [# 8–2].

207. Tr. 29 [# 8–2] (citing SSR 96–5p).

208. *See* sources cited *supra* note 187.

209. *See* 20 C.F.R. §§ 404.1513, 416.913.

210. *See id.* §§ 404.1527(c)(2), 416.927(c)(2).

211. *See* Tr. 18–31 [# 8–2].

212. *See* sources cited *supra* note 192.

213. *Cabral v. Colvin*, No. 12–11757–FDS, 2013 WL 4046721, at *8 (D.Mass. Aug. 6, 2013) (citing SSR 96–7p (July 2, 1996); 20 C.F.R. §§ 404.1529(c)(1), 416.929(c); *Nguyen*, 172 F.3d at 34).

214. *Gray v. Heckler*, 760 F.2d 369, 374 (1st Cir.1985) (citing *Alvarado v. Weinberger*, 511 F.2d 1046, 1049 (1st Cir.1975) (per curiam)).

ble.' " [215] Rather, the

determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.[216]

Importantly, in assessing a claimant's credibility, "an ALJ should not reject subjective allegations of pain solely because they are inconsistent with the medical record." [217]

In *Bjornson v. Astrue*, a Seventh Circuit decision written by Judge Posner, the court discussed an ALJ's determination of the credibility of a Social Security claimant.[218] In *Bjornson*, the ALJ had written the following regarding the claimant's credibility:

After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.[219]

The court explains that this "boilerplate" language is a "passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains." [220] Yet the court goes on to eviscerate the use of this language: " 'Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.' " [221] Moreover, this boilerplate language is not even technically correct, because "the assessment of the claimant's 'residual functional capacity' ... comes later in the administrative law judge's opinion, not 'above'—above is just the foreshadowed conclusion of that later assessment." [222] The passage thus "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards." [223]

---

**215.** SSR 96–7p.

**216.** *Id.; see Da Rosa*, 803 F.2d at 26 (remanding credibility decision to ALJ and stating that any new credibility finding "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the appellant"); *Guyton*, 20 F.Supp.2d at 166 ("[A] general reference to the record stating that 'Claimant's testimony regarding pain and discomfort is not credible to the extent alleged in light of the evidence of record' ... does not satisfy the requirement of specific findings for credibility determinations.").

**217.** *Cabral*, 2013 WL 4046721, at *8 (citing *Pires v. Astrue*, 553 F.Supp.2d 15, 22–23 (D.Mass.2008); SSR 96–7p; *Valiquette v. Astrue*, 498 F.Supp.2d 424, 433 (D.Mass.2007)).

**218.** 671 F.3d at 644–47.

**219.** *Id.* at 644 (alteration in original).

**220.** *Id.* at 645.

**221.** *Id.* (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir.2004)). The quote from *Hardman* continues: " 'More troubling, it appears that the Commissioner has repeatedly been using the same boilerplate paragraph to reject the testimony of numerous claimants, without linking the conclusory statements contained therein to evidence in the record or even tailoring the paragraph to the facts at hand, almost without regard to whether the boilerplate paragraph has any relevance to the case.' " *Id.* (quoting *Hardman*, 362 F.3d at 679).

**222.** *Id.*

Here, the ALJ did not find credible Plaintiff's claims regarding his symptoms.[224] The ALJ used language almost identical to the language used by the ALJ in *Bjornson* (the only difference being that the ALJ here used the word "could" where the *Bjornson* ALJ used the word "would").[225] Such language does not convince this court that the ALJ did anything other than "reject subjective allegations of pain solely because they [were] inconsistent with the medical record."[226]

Of course, the ALJ was free to conclude that Plaintiff's subjective claims of pain were not credible. But if he were to do so, the ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific."[227] Because the ALJ's decision here does not reach that standard, this case is remanded so that the ALJ may, among other things, make specific findings as to the credibility of Plaintiff.

### 3. *Testimony of the Vocational Expert*

Plaintiff argues that the ALJ relied upon flawed testimony from a vocational expert because the ALJ posed to the vocational expert a hypothetical question based on the ALJ's flawed RFC finding.[228] Because this court remands this case for the reasons discussed above, the SSA must hold a new hearing on Plaintiff's case. As such, the ALJ must reconsider Plaintiff's RFC. This court thus finds it unnecessary to consider whether or not the ALJ's 2010 RFC finding, which is outdated by virtue of this decision, was flawed.

### IV. *Conclusion*

For the foregoing reasons, Plaintiff's *Motion for Judgment on the Pleadings* [# 12] is ALLOWED and Defendant's *Motion to Affirm the Commissioner's Decision* [# 18] is DENIED. This case is REMANDED to the Social Security Administration for a new hearing and decision consistent with this opinion.

AN ORDER HAS ISSUED.

### *ORDER*

For the reasons set forth in the accompanying Memorandum, this court hereby orders that Plaintiff's *Motion for Judgment on the Pleadings* [# 12] is ALLOWED and Defendant's *Motion to Affirm the Commissioner's Decision* [# 18] is DENIED. This case is REMANDED to the Social Security Administration for a new hearing and decision consistent with this opinion.

IT IS SO ORDERED.

---

223. *Id.* Judge Posner continues: "[T]he boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be." *Id.* at 645–46.

224. Tr. 28 [# 8–2].

225. *See* Tr. 28 [# 8–2]; *Bjornson,* 671 F.3d at 644.

226. *Cabral,* 2013 WL 4046721, at *8.

227. SSR 96–7p.

228. Pl.'s Mem., 28 [# 13].